UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
VISUAL FOOTCARE TECHNOLOGIES, LLC,  :
                                    :         13 Civ. 4588 (JSR)
     Plaintiff,                     :
                                    :         MEMORANDUM ORDER
     -v-                            :
                                    :
CFS ALLIED HEALTH EDUCATION, LLC and :
RICK SEVIER,                        :
                                    :
     Defendants.                    :
------------------------------------x



JED S. RAKOFF, U.S.D.J.

Plaintiff Visual Footcare Technologies, LLC ("VFT") brings this action for breach of contract, replevin, and tortious interference with contract against Defendants CFS Allied Health Education, LLC ("CFS") and Rick Sevier. VFT is a medical services and device company that supplies diagnostic devices and orthotic shoes and insoles to Walgreens, Inc. CFS, which is owned and operated by Sevier, offers training services on orthotic footware, and pursuant to a contract with VFT, provides training to Walgreens employees to enable them to use and sell VFT's products. VFT alleges that CFS and Sevier have wrongfully denied VFT full and unfettered access to certain proprietary information of VFT and to a software program that Sevier and others developed for VFT.

On July 23, 2013, the defendants moved to dismiss the complaint for lack of personal jurisdiction and improper venue, or in the alternative to transfer the case to the Northern District of Oklahoma, where the defendants are based. This Court ordered

1

jurisdictional discovery and held an evidentiary hearing on August 12, 2013. On August 19, 2013, the Court issued a "bottom-line" order granting the defendants' motion to dismiss for lack of personal jurisdiction. This Memorandum Order explains the reasons for that ruling and directs the entry of final judgment.

The pertinent facts, as found by the Court, are as follows. VFT is a privately held company, organized under the laws of New York with its principal place of business in New York. Transcript of Evidentiary Hearing on August 12, 2013 ("Tr.") at 5-8; ex. 1. VFT develops medical devices and healthcare services for patients suffering from diabetes. Tr. at 4; Affidavit of Scott R. Kantro in Supp. of Order To Show Cause ("Kantro Aff."), ¶ 2. VFT has developed several patented diagnostic devices that facilitate the identification, monitoring, and treatment of diabetic footcare problems at an early stage, to avoid the need for amputation. Tr. at 4-5; Kantro Aff. ¶ 4. VFT uses these diagnostic devices to sell orthotic shoes and insoles to patients. Tr. at 10; ex. 3. VFT's Chairman and CEO is Dr. Scott R. Kantro, a licensed podiatrist. Tr. at 4, 17, 52-53; Kantro Aff. ¶ 1.

CFS is a small family business, organized under the laws of Oklahoma with its principal place of business in Oklahoma. Tr. at 76-78; Aff. Of Rick Sevier in Supp. of Defendants' Joint Mot. To Dismiss ("Sevier Aff."), ¶¶ 1, 6. Owned and operated by Rick Sevier and his wife, Yolanda Sevier, CFS provides online educational services in the field of orthotic footwear, and also holds

occasional live training seminars around the country. Id. ¶ 5; Tr. at 77-78, 88.

On July 26, 2010, VFT and CFS entered into a contract whereby CFS was to provide training to the employees of VFT's customers to enable those customers to sell VFT's products to patients. VFT Business Partner Confidentiality, Alliance and Commission Agreement ("Agreement"), Tr. at 8, ex. 2. VFT's first and only customer is Walgreens. Id. at 1; Tr. at 5, 57. The Agreement permits VFT to directly integrate CFS's training services into its offering to Walgreens and provides that, in exchange, CFS will be paid a one percent commission on VFT's product sales to Walgreens. Agreement at 1.

The Agreement requires CFS to keep all information it obtains from VFT as part of their relationship confidential and gives VFT the right to demand the return or destruction of all proprietary information given to CFS by VFT. Id. at 1-2. The Agreement, which is the only written contract between the parties, Tr. at 59, does not reference any work done by Sevier and does not include any provision for the development of intellectual property by Sevier. To the contrary, the Agreement states: "This agreement in no way constitutes a sale of rights or property to VFT." Agreement at 1.

The Agreement contains a New York choice-of-law clause, id. at 2, and was negotiated and executed on behalf of VFT from New York, Tr. at 9, 67. At no point during the negotiation of the Agreement, however, did Sevier or any CFS representative travel to New York.

3

The Agreement was negotiated and signed on behalf of CFS by Sevier in Oklahoma. Tr. at 9, 67; Sevier Aff. ¶¶ 15-16. The Agreement does not require CFS to send notices or payments to New York, nor does it call for any performance by CFS in New York, any physical presence of CFS in New York, or any supervision of CFS by VFT in New York. Neither CFS nor Sevier has any property, employees, bank accounts, or phone numbers in New York. Tr. at 70, 76-78; Sevier Aff. ¶ 7.

As a result of the contractual relationship between CFS and VFT, Sevier had extensive contact with VFT, including through phone calls, emails, and electronic meetings organized through an online service. Tr. at 13-14, 17-18, 23-24, 29-31, 40-43, 45-48, 85-86, 90-91. Some of these communications related to the contractual training services CFS provided, but "the bulk of the communication . . . did not relate to the contract." Tr. at 82. Instead, these communications amounted to general consulting services provided to VFT by Sevier, for which Sevier has never been paid. Tr. at 62-63, 82. Sevier testified that he believed that by consulting with VFT to make its relationship with Walgreens more profitable, he would increase the value of the commission CFS earned on VFT's sales to Walgreens. Tr. at 82-83. That commission, however, has never been paid. Sevier Aff. ¶¶ 20-21, 56.

As part of its dealings with Walgreens, VFT uses a computer software program to collect and manage the insurance and billing documentation and the like from patients, known as a document

4

procurement program. Before mid-2011, VFT licensed a document procurement program called "Zowie" from an outside vendor. Sevier Aff. ¶ 26-27; Tr. at 91. In mid-August 2011, however, Sevier, Kantro, VFT's then-President Andrew Singer, and a then-VFT contractor Jennifer Cunnigham participated in a telephone call discussing the possibility of replacing that program. Sevier Aff. ¶ 20. Sevier volunteered that he was proficient in computer programming and could write a suitable replacement himself. Kantro and Singer accordingly tasked him with doing so. Id. ¶ 29; Tr. at 91-92.

Sevier then began working to develop the software program now at issue in this action, called eDocs. Sevier initially worked on the program himself, but VFT later hired other consultants and employees to work on the program along with Sevier. Sevier Aff. ¶¶ 30-32, 37-41; Reply Aff. of Scott R. Kantro, ¶¶ 10, 12, 20-21, 29. VFT began using eDocs for the input of live records in July 2012. Sevier Aff. ¶ 50. Around the same time, VFT moved its procurement center from Sweetwater, Texas to Catoosa, Oklahoma, where Sevier lives. The procurement center initially operated from Sevier's home, but was moved to an office elsewhere in Catoosa within a few months. Id. ¶¶ 45-46. Sevier was tasked with overseeing the procurement center. Id. ¶ 42; Tr. at 85.

From the beginning, eDocs was hosted on an external server provided by a third-party hosting service under Sevier's account. Sevier Aff. ¶¶ 33-34. VFT paid for the domain name for the program

5

and also paid the monthly hosting fees for the first year of eDocs's operation, but CFS has paid those fees since that time. Id. ¶¶ 34-35, 63.

VFT has never paid Sevier for the work he performed in writing the code for eDocs and overseeing VFT's procurement center. Tr. at 62-63; Sevier Aff. ¶ 56. The parties did discuss remuneration, however, over the course of several months in early 2012. Id. ¶ 42-43. In July 2012, VFT sent Sevier a proposed agreement, which would have set Sevier's compensation and also would have assigned VFT full right to eDocs. Sevier refused to sign this proposed agreement because it differed from the parties' previous discussions. Id. ¶ 57.

Around June 15, 2013, VFT locked Sevier out of VFT's Catoosa procurement center, which Sevier had been overseeing. Id. ¶ 60. In response, on June 19, 2013, Sevier changed the passwords to the eDocs program, denying VFT access to the program. Sevier then restored the passwords less than two hours later, and has not logged into the program since. Id. ¶ 61. Nevertheless, because the program is hosted by a third-party service under Sevier's account, Sevier retains access to certain password-protected administrative functions of the program. Id. ¶ 62.

On July 2, 2013, VFT filed its complaint in this action. VFT claims that Sevier and CFS have violated the Agreement, appropriated VFT's intellectual property, and interfered with VFT's contractual relationship with Walgreens. VFT claims that Sevier and CFS have

6

done so by changing the passwords to the eDocs program and by storing VFT's proprietary information, including sensitive patient information, on a server that VFT cannot fully access or control.

With respect to personal jurisdiction, the record reveals the following contacts between the defendants and the state of New York.

First, on two occasions in July and December 2010, CFS arranged for independent contractors to provide live training services to non-VFT clients in New York. CFS and the independent contractors evenly split the proceeds of these training sessions. See Sevier Suppl. Aff. ¶¶ 3-4.

Second, on July 26, 2010, as described above, Sevier signed the Agreement on behalf of CFS. The Agreement was negotiated and signed on behalf of VFT in New York, and contains a New York choice-of-law clause.

Third, in connection with the Agreement and with Sevier's general consulting work for VFT, Sevier communicated extensively with VFT officers and representatives in New York. Sevier's communications often resulted in VFT taking various actions with respect to its business in and from New York. Tr. at 19, 21-23. CFS's training services under the Agreement, however, were always provided outside of New York. These training services primarily took the form of distance-learning videos, although Kantro testified that CFS conducted "two or three" live training sessions for Walgreens on behalf of VFT outside of New York. Tr. at 65.

7

Fourth, on three occasions – in March 2011, May 2012, and March 2013 – Sevier traveled to New York for several days to provide training services on behalf of CFS to a non-VFT client. On two of those occasions, Sevier met with VFT representatives while here. In particular, in March 2011, he met with Kantro, Cunnigham, and another VFT employee in order to meet them face to face and to discuss Cunnigham's role with VFT, Tr. at 31-35; Sevier Aff. ¶ 9; Sevier Suppl. Aff. ¶ 6. Similarly, in May 2012, Sevier, along with his wife, met with Kantro and Singer to discuss plans for Sevier to oversee VFT's procurement center, where eDocs was to be implemented. Tr. at 38-39; Sevier Aff. ¶¶ 11, 42-43; Sevier Suppl. Aff., ¶ 5. VFT paid for Sevier's expenses in New York for these trips. Tr. at 31-34, 38-39, 83-85. Sevier did not meet with VFT representatives during his March 2013 visit to New York. Tr. at 39-40; Sevier Aff. ¶ 12.

Fifth, in October 2011, Sevier and his wife conducted a live training session on behalf of CFS for a non-VFT client in Philadelphia. Afterwards, Sevier and his wife traveled to New York City to meet with various VFT representatives, and the parties later had dinner at Kantro's residence in Connecticut. Tr. at 36-37; Sevier Aff. ¶ 10. VFT also paid for Sevier's expenses on this trip. Tr. at 37-38.

Finally, CFS has marketed its training services in New York in several ways. To begin with, CFS maintains an interactive website through which customers located anywhere, including New York, may

8

purchase access to online training sessions and order training videos. CFS's website also advertises live training sessions, and currently states that, "[p]er popular demand, CFS is taking their classes on the road Nationwide in 2013! We are travelling to the following cities: . . . Buffalo, NY - New York City, NY . . . ." Tr. at 48-50, ex. 19. Sevier explains, however, that these statements refer to past trips to New York, and not planned future trips. Sevier Suppl. Aff. ¶ 10. In addition, in advance of Sevier's March 2013 trip to New York, CFS, with the help of certain VFT employees, prepared a New York-specific mailing list of potential students, to which it sent promotional postcards. Sevier Suppl. Aff. ¶¶ 13-14. Lastly, in 2013 CFS began using a marketing service called "Constant Contact," which uses email lists to reach potential customers around the country, including New York. These emails now reach around 5,000 people, but reached only about 2,500 when CFS last advertised New York classes through the service. Sevier Suppl. Aff. ¶¶ 11-12. Between January 1, 2010 and July 31, 2013, CFS earned approximately $33,937 of its $689,195.35 in total revenue, or 4.92%, from New York. Sevier Suppl. Aff. ¶¶ 17-18.

The instant motion challenges this Court's personal jurisdiction over the Oklahoma-based defendants. "In diversity cases, federal courts must look to the forum state's long-arm statute to determine if personal jurisdiction may be obtained over a nonresident defendant." Savin v. Ranier, 898 F.2d 304, 306 (2d Cir. 1990). When personal jurisdiction is contested, "the plaintiff

bears the burden of showing that the court has jurisdiction over the defendant." Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996). "[W]hen an evidentiary hearing is held, the plaintiff must demonstrate the court's personal jurisdiction over the defendant by a preponderance of the evidence." Id.

VFT argues that both CFS and Sevier are subject to personal jurisdiction under two provisions of New York's long-arm statute. First, it is well established under § 301 of the New York CPLR that a foreign defendant is subject to suit in New York if the defendant is "engaged in such a continuous and systematic course of doing business here as to warrant a finding of its presence in this jurisdiction." Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990) (quotation marks omitted). A defendant found to be "doing business" in New York is subject to general jurisdiction here, and thus may be sued in New York on any claim, whether or not the claim relates to the defendant's contacts here. See Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir. 2000)

To satisfy the requirement of "doing business" in this state, the defendant's contacts here must show "continuous, permanent and substantial activity in New York." Landoil, 918 F.2d at 1043 (quotation marks omitted). Factors relevant to this determination include "the existence of an office in New York; the solicitation of business in New York; the presence of bank accounts or other property in New York; and the presence of employees or agents in New

10

York." Id. The "doing business" test "is most often used to find jurisdiction over a corporate defendant," but the test "can be applied to a nonresident individual, provided that the defendant is 'doing business' in New York personally and not on behalf of a corporation." Patel v. Patel, 497 F. Supp. 2d 419, 425 (E.D.N.Y. 2007).

VFT's claim that Sevier is "doing business" in New York under § 301 as an individual is easily rejected. The evidence shows that Sevier lives in Oklahoma and has made brief visits to New York only four times. On one of those visits, moreover, in March 2013, Sevier only conducted a training session on behalf of CFS, and did no business in his individual capacity. Sevier also frequently communicated with VFT representatives in New York, but aside from three face-to-face meetings in New York, these communications took place while Sevier was elsewhere. These negligible contacts are far too sparse and sporadic to establish the "continuous and systematic" conduct necessary under § 301. Indeed, courts have frequently found allegations far more substantial than these to be completely inadequate. See, e.g., Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57-58 (2d Cir. 1985) (finding "extensive" correspondence regarding the parties' business relations and fifty-four visits to New York "insufficient . . . to make out even a prima facie case" for "doing business" jurisdiction); see also Patel, 497 F. Supp. 2d at 426 (collecting additional cases).

11

VFT's claim that CFS is "doing business" in New York is more colorable, but still ultimately fails. CFS is not licensed to do business in New York; it has no office or employees here; and it has no bank accounts, property, or listed phone number here. Thus, nearly all of the central factors relevant to "doing business" weigh against personal jurisdiction. See Landoil, 918 F.2d at 1043.

CFS does, to be sure, solicit business in New York. But over a three-year period, CFS's contacts with New York amount to (1) three trips to the state by employees; (2) two in-state training sessions by independent contractors; (3) an ongoing contractual relationship with VFT, a New York company; (4) an interactive website that advertises occasional live training sessions in New York; (5) a small nationwide email marketing campaign; (6) a single, isolated postcard publicity project targeting New York; and (7) sales from New York totaling under $34,000, representing less than five percent of the company's total revenue.

Courts have consistently found these types of sporadic visits, minor solicitation activities, and insignificant sales insufficient to establish that a defendant is "doing business" in New York. See, e.g., id. at 1046 (holding that "sporadic visits," even "when taken in connection with" other solicitation activities in New York, are insufficient); C.B.C. Wood Products, Inc. v. LMD Integrated Logistics Servs., Inc., 455 F. Supp. 2d 218, 223-24 (E.D.N.Y. 2006) ("A firm does not 'do[] business' in New York simply because New York citizens can contact the firm via the worldwide web."

12

(quotation marks omitted)); Copterline Oy v. Sikorsky Aircraft Corp., 649 F. Supp. 2d 5, 16-17 (E.D.N.Y. 2007) ("District courts in this Circuit agree that where a foreign corporation derives less than five percent of its overall revenue from sales in New York, such sales are not substantial enough to force a foreign defendant to litigate in New York."). The contacts shown here simply do not rise to the level of "continuous, permanent and substantial activity in New York." Landoil, 918 F.2d at 1043 (quotation marks omitted).[1]

In addition to general jurisdiction under § 301, VFT also claims that both Sevier and CFS are subject to specific jurisdiction under § 302(a)(1) of the New York CPLR. Section 302(a)(1) provides that a defendant may be sued in New York if (1) the defendant "transacts any business within the state" and (2) the claim arises from that transaction of business. See Sunward Electronics, Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004). With respect to the first requirement, "[a] nondomiciliary 'transacts business' under CPLR 302(a)(1) when he purposefully avails himself of the privilege of conducting activities within New York, thus invoking the benefits

---

[1] Even if VFT succeeded in arguing that the contacts here rise to the level of "doing business" in New York, the Court is skeptical that the exercise of general jurisdiction here would comport with the Due Process Clause. See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127-29 (2d Cir. 2002) (explaining that a state may assert general jurisdiction over a defendant consistent with the Due Process Clause only where the defendant's contacts with the forum are "continuous and systematic" and where the exercise of jurisdiction is "reasonable under the circumstances of the particular case" (quotation marks omitted)). Because statutory personal jurisdiction is lacking, however, the Court need not reach this constitutional question.

and protections of its laws." CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986) (quotation marks omitted). In making this determination, courts consider several factors, including

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires [the defendants] to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

Id. (quotation marks omitted). While all of these factors are relevant, "no one factor is dispositive and others may be considered." Id.

With respect to the second requirement of § 302(a)(1), "New York does not require that the acts constituting the alleged breach of contract take place in New York." Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 59 (2d Cir. 1985). Rather, "[a] cause of action 'arises out of' a defendant's transaction of business in New York for purposes of Section 302(a)(1) when there exists an articulable nexus or a substantial relationship between transactions occurring within the state and the cause of action sued upon." Sunward Electronics, 362 F.3d at 23 (quotation marks omitted).

As to Sevier individually, VFT's arguments for specific jurisdiction fare no better than its arguments for general jurisdiction. Sevier is not a party to the Agreement, which he signed solely in his capacity as an agent on behalf of CFS. Sevier

14

met with VFT representatives in New York on only three occasions, in March 2011, October 2011, and May 2012, when Sevier was traveling to New York or nearby on other business. During those meetings, Sevier and VFT discussed various aspects of VFT's operations, but the record discloses no concrete transactions that were conducted during these meetings. And even if Sevier had transacted business in one or more of those meetings, VFT's claims in no sense arise from those transactions, which are not even alleged in VFT's complaint. Rather, VFT's claims arise solely from the Agreement and from Sevier's conduct with respect to eDocs in Oklahoma.

VFT's arguments for specific jurisdiction over CFS once again present a closer question. With respect to whether CFS transacted business in New York, VFT points out (1) that the Agreement creates an ongoing contractual relationship between CFS and VFT, a New York corporation; (2) that the Agreement contains a New York choice-of-law clause; and (3) that Sevier, CFS's principal, met with VFT representatives in New York on three occasions. See Sunward Electronics, 362 F.3d at 22. On the other hand, CFS negotiated and executed the Agreement in Oklahoma, and no CFS employee set foot in New York until after the Agreement was signed. Furthermore, neither the Agreement itself nor the surrounding discussions contemplated any performance by CFS in New York, any physical presence of CFS in New York, or any supervision of CFS in New York. Nor does the Agreement require CFS to send notices or payments to New York.

15

On balance, the Court concludes that CFS cannot fairly be said to have transacted business in New York. Judge Kaplan recently confronted a similar constellation of facts in Navaera Sciences, LLC v. Acuity Forensic Inc., 667 F. Supp. 2d 369 (S.D.N.Y. 2009). There, a Canadian defendant had entered into a contract containing a New York choice-of-law clause with a New York plaintiff. Id. at 371, 375. As part of the contractual relationship, the defendant sent notices to New York and traveled to New York to meet with the plaintiff on one occasion. Id. at 375-76. Judge Kaplan found it "of 'great[] significance'" that the contract was performed outside of New York. Id. at 376 (quoting Lehigh Val. Indus., Inc. v. Birenbaum, 527 F.2d 87, 91 (2d Cir. 1975)). He then concluded that the defendant's other contacts with New York were insufficient "because [the defendant] did not project itself into the New York market or purposefully avail itself of the privilege of doing business in New York." Id. at 377.

The Court finds this analysis instructive. Indeed, the defendant in Navaera, which had sent contractual notices to New York, in some sense had a greater connection to New York than CFS, which has not done so. Furthermore, while the defendant here met with the plaintiff in New York three times rather than just one, as in Navaera, the meetings in this case were largely incidental to the contractual relationship between CFS and VFT. The meetings occurred only when Sevier was traveling to New York or nearby on other business, and the discussions primarily concerned Sevier's general

16

consulting work for VFT rather than CFS and VFT's contractual relationship per se. In only one of the meetings, moreover, in May 2012, did the parties discuss the eDocs program. The Court concludes that CFS has not purposefully availed itself of the privilege of doing business in New York. CFS thus did not transact business in New York, and thus cannot be subject to specific jurisdiction here.[2]

Accordingly, for the foregoing reasons, the Court hereby confirms its bottom-line order of August 19, 2013, dismissing all claims for lack of personal jurisdiction. The Clerk of the Court is directed to enter final judgment.

SO ORDERED.

Dated:   New York, NY
         February 20, 2014

                                        JED S. RAKOFF, U.S.D.J.

---

[2] Having found that neither defendant transacted business in New York, the Court need not address whether VFT's claims arise from the transaction of business in New York. Similarly, having found that it lacks personal jurisdiction over the defendants, the Court need not address the defendants' contention that venue in this district is improper. The Court also need not address the defendants' request in the alternative to transfer this case to the Northern District of Oklahoma. For the benefit of the parties, however, the Court notes that if it did in fact possess personal jurisdiction, the Court would be inclined to grant the motion for transfer. See Tomita Technologies USA, LLC v. Nintendo Co., Ltd., 818 F. Supp. 2d 770, 772 (S.D.N.Y. 2011) (setting forth the factors relevant to deciding a motion to transfer venue).

17